Application for a Complaint by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

United States of America
v.
DANIEL SLATER,

*Defendant(s)*

Case No. 20-8216-BER

FILED BY TM D.C.
Jun 15, 2020
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 29, 2020, to June 12, 2020 in the county of Palm Beach in the Southern District of Florida, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1958 | To knowingly use and cause another to use any facility of interstate and foreign commerce with the intent that murder be committed in violation of the laws of any State of the United States of America, as consideration for the receipt of, or as consideration for a promise and agreement to pay, anything of pecuniary value. |
| 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 | Possession with intent to distribute a controlled substance. |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

❒ Continued on the attached sheet.

*Complainant's signature*

Jessie Apaza, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by FaceTime.

Date: 06/15/2020

*Judge's signature*

City and state: West Palm Beach, Florida

Bruce E. Reinhart, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Jessie Apaza, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent for the Federal Bureau of Investigation ("FBI") currently assigned to the Violent Crimes/Fugitive Task Force in the Miami Division, and have been so assigned for the last 20 months. Prior to my assignment to the Violent Crimes/Fugitive Task Force, I was assigned to the Complex Financial Crimes squad for three years. I have received training at the FBI Academy in Quantico, Virginia. As a Special Agent for the FBI, my current duties involve investigating bank robberies, Hobbs Act robberies, extortion, and other violations of federal law. Prior to my employment as a Special Agent with the FBI, I worked as an FBI Investigative Specialist from June 2010 to September 2015 where I investigated threats to national security.

2. This affidavit is submitted in support of a criminal complaint against DANIEL SLATER ("SLATER"). As explained below, there is probable cause to believe that, between on or about May 29, 2020, and on or about June 12, 2020, SLATER used and caused the use of a facility of interstate commerce, that is, an automobile and cellular telephone, with the intent that a murder be committed in violation of the laws of any State of the United States of America as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, in violation of Title 18, United States Code, Section 1958; and that, on or about June 4, 2020, SLATER knowingly and intentionally possessed with intent to distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

3. The information in this affidavit is based on my own personal knowledge as well as information provided by other individuals, including other law enforcement officials, and on

my review of records obtained during the course of this investigation. This affidavit is also based on information provided by a Cooperating Human Source ("CHS"), who has proven reliable and who has provided information that has been independently corroborated, as set forth in part herein, including through recorded conversations. I have not included in this affidavit each and every fact and circumstance known to me, but only those facts and circumstances sufficient to establish probable cause for SLATER's arrest for the violation described above.

**PROBABLE CAUSE**

4. On or about February 24, 2020, law enforcement found a 26-year-old deceased female within Everglades National Park, in Miami, Florida. The FBI initiated an investigation.

5. The FBI's investigation of Victim 1's death led them to an individual ("Witness 1"), who told them that SLATER had previously asked him or her to kill the family of SLATER's ex-girlfriend ("Individual 1") in exchange for drugs or money.

6. Law enforcement's investigation also led them to another individual, the CHS, who had pre-existing relationships with various subjects-of-interest in the death of Victim 1, including SLATER.

7. The CHS told law enforcement that he or she regularly associated with SLATER and his affiliates. According to the CHS, SLATER had previously discussed his desire to stalk his ex-girlfriend, Individual 1, and kill members of her family, whom SLATER believed had impeded their relationship. The CHS also stated that, sometime in early 2020, SLATER had paid him or her money to murder someone associated with Individual 1. The CHS took the money at the time, but did not go through with the murder.

8. The CHS further explained that SLATER had tasked Victim 1 with surveilling Individual 1 and Individual 1's then-boyfriend. The CHS stated that SLATER ordered Victim 1 to

develop a relationship with Individual 1's boyfriend and then kill him. But, according to the CHS, Victim 1 was unable to go through with the murder.

9. Following the interview, the CHS began working with the FBI. As part of the CHS's cooperation, law enforcement provided the CHS with audio and video recording devices.

10. On or about June 3, 2020, in the midnight hours, the CHS and SLATER met at an establishment in Palm Beach County. During this meeting, which was audio and video recorded, SLATER asked the CHS to "get [Individual 1] by Sunday," and suggested throwing "acid on her face."

11. The next night, still on or about June 3, 2020, the CHS and SLATER again met, this time at a residence in Palm Beach County. During this meeting, which was audio and video recorded, the two again discussed what SLATER wanted the CHS to do to Individual 1. SLATER specifically asked the CHS to beat up Individual 1, knock her teeth out, and break her nose. The CHS then asked SLATER if he wanted anything to be done to Individual 1's family, and explained that he or she needed money and was "for real this time." SLATER stated that after the CHS took care of Individual 1, they could "go from there," but then said that the CHS could "do the sister"—referring to Individual 1's sister ("Victim 2")—and promised to "help [the CHS] out," and mentioned giving the CHS $200 and some narcotics to sell.

12. On or about June 4, 2020, SLATER had a telephonic conversation in which SLATER instructed the CHS to collect narcotics from one of SLATER's affiliates. SLATER instructed the CHS to sell the cocaine, give SLATER approximately $2,100, and keep the rest of the profits.

13. In recorded telephonic conversations of that event, SLATER confirmed that he had spoken to his affiliate and arranged the distribution of "34 total" to the CHS. And, in a recorded

conversation with SLATER's affiliate, the affiliate confirmed that he or she had spoken to SLATER, and then arranged a meeting with the CHS.

14. The CHS went to the meeting location and retrieved the suspected cocaine, which field-tested positive for the presence of cocaine.

15. On or about June 8, 2020, the CHS contacted SLATER on his cell phone and the two agreed to meet. During the meeting, SLATER requested that the two drive by Victim 2's house.

16. So, at SLATER's behest, the CHS and SLATER traveled to Victim 2's house in the CHS's vehicle, in Palm Beach County.

17. During the car ride, which was recorded, SLATER provided Victim 2 with instructions on how to carry out the murder of Victim 2 and her husband ("Victim 3"). More specifically, SLATER pointed out a window in the home, explained how Victims 2 and 3 sat in their living room at specific times, and told the CHS to shoot the victims through the window during one of those times. SLATER also instructed the CHS to spray-paint the home with the words, "Black Lives Matter," to make it appear as if members associated with that movement were responsible for the murders.

18. On or about June 10, 2020, the CHS and SLATER met again, after having set up the meeting by phone, and discussed payment for the planned murders of Victim 2 and Victim 3. At one point, SLATER told the CHS, "you see what we got going . . . the money at the end of the line." In addition, due to prior dealings that occurred before the CHS started working for law enforcement, the CHS owed SLATER money. When the CHS acknowledged the debt, SLATER told him not to worry, that he would take "that off" the debt. Over the course of these meetings, the CHS, as instructed by law enforcement, had told SLATER that he or she would be relying on

a hitman to help him or her carry out the murder. Unbeknownst to SLATER, the hitman was an undercover agent with the FBI (the "UC"). The CHS pointed out that the hitman would require payment, and SLATER assured the CHS that he would take care of the payment. In summation, SLATER explained, "We'll just take a little bit off [the debt], still give you a chunk, help you with the attorney. . . . Listen, we just got to get this through, straight up."

19. On or about June 12, the CHS called SLATER on his cell phone and informed him that the murders had been carried out, and the two arranged to meet in person.

20. A few hours later, the CHS spoke to SLATER on his cell phone and they discussed the murders. During the conversation, SLATER told the CHS that he would see if he could withdraw some cash to make payment to the hitman that night.

21. In another telephonic conversation concerning the murders, SLATER told the CHS that full payment would have to wait until Monday because the banks were closed, but assured the CHS that he would "pay everything." Nonetheless, SLATER told the CHS that he would make a payment that evening to the hitman, but explained that he was waiting to hear back from his affiliate, who normally carried cash on hand.

22. Later in the evening, SLATER and the CHS met at a pre-determined location in Palm Beach County for the purpose of SLATER making a payment, which would go towards the hitman, for the murders. SLATER drove to the meeting location in his registered vehicle, a white Dodge Ram pickup truck, bearing license plate ending J75.

23. Once at the meeting location, SLATER and the CHS further discussed the murders. The CHS showed SLATER a photo-shopped photograph of Victims 2 and 3's dead bodies. SLATER provided the CHS with $400 for the hitman, and promised additional payment. After the meeting, the CHS turned over the $400 to law enforcement.

24. Furthermore, SLATER asked the CHS to, along with the hitman, murder another person ("Victim 4"), and provided instructions on how he would like to murder to be carried out. SLATER declined to meet the hitman until after the additional murder.

25. A database search conducted by the FBI for SLATER's known wireless telephone number—the number used by SLATER to communicate with the CHS—confirmed that the telephone utilizes the cellular telephone network of Sprint. Based on my training and experience, I am aware that Sprint is an interstate provider of cellular communications, and that the telephone lines and equipment used by SLATER to arrange the murders of Victim 2 and Victim 3 are facilities of interstate commerce.

[INTENTIONALLY LEFT BLANK]

26. Based on the foregoing, I submit there is probable cause to believe that, between on or about May 29, 2020, and on or about June 12, 2020, SLATER used and caused the use of a facility of interstate commerce, that is, an automobile and cellular telephone, with the intent that a murder be committed in violation of the laws of any State of the United States of America as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, in violation of Title 18, United States Code, Section 1958; and that, on or about June 4, 2020, SLATER knowingly and intentionally possessed with intent to distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

Jessie Apaza, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by FaceTime, this 15th day of June, in WEST PALM BEACH.

HONORABLE BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NUMBER:** 20-8216-BER

**BOND RECOMMENDATION**

DEFENDANT: ______________________________

______________________________
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: ______________________________
**AUSA:**

Last Known Address: ______________________________

______________________________

______________________________

What Facility: ______________________________

______________________________

Agent(s): ______________________________
(FBI) (SECRET SERVICE) (DEA) (IRS) (ICE) (**OTHER**)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.** 20-8216-BER

**UNITED STATES OF AMERICA**

**v.**

**DANIEL SLATER,**

**Defendant.**
______________________________/

**CRIMINAL COVER SHEET**

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)? __Yes X No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? __Yes X No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By: */s/ Jessica Kahn Obenauf*

JESSICA KAHN OBENAUF
Assistant United States Attorney
Florida Bar No. 0052716
DAYRON SILVERIO
Assistant United States Attorney
Florida Bar No. 112174
99 N.E. 4th Street
Miami, Florida 33132-2111
T. (305) 961-9317
F. (305) 530-7976
Jessica.obenauf@usdoj.gov
Dayron.Silverio@usdoj.gov